IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BERNICE MYLES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:07CV83-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Bernice Myles brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff was born on September 30, 1958. In the present application for supplemental security income benefits, filed on November 18, 2003 (protective filing date), she alleges that she became disabled on March 28, 2002 due to "bronchitis, sugar, HBP, swelling in bot[h] legs, arth[ri]tis in shoulder, lower back pain, numbness in hands, sinus." She asserts that her condition limits her ability to work because she has to sit down and catch her breath, her back hurts a lot when she lies down or stands for a period of time, and her feet swell when she sits

or stands for a period of time. (R. 60, 69).

Plaintiff was under the care of Tammy Mason, CRNP, between March 2001 and July 2005. (Exhibits B5F and B10F). On March 8, 2001, plaintiff reported that her right arm had been hurting for five to six months, that tilting her head to the left made it feel better and that it hurt worse at night if she did not move her arm for a while. Her weight was 205 and her blood pressure was 160/100. Mason diagnosed hypertension, cervical radiculopathy and obesity. She prescribed medications and ordered lab work. (R. 194). The treatment note for plaintiff's visit one week later indicates that her range of motion was good in both arms, but that movement of her right arm out and up caused pain in the middle of her right shoulder. Mason's notes reflect diagnoses of non-insulin-dependent diabetes mellitus ("NIDDM"), hypertension ("HTN") and cervical radiculitis. Mason wrote, "Pt. decided to try diet control for diabetes, if doesn't work will start Glucotrol." (R. 193). Plaintiff returned to the clinic for re-check of her blood pressure and blood sugar on March 26th and April 30, 2001. She continued to complain of neck and arm pain. Her reflexes were 2+ and her reflexes and grip strength were equal bilaterally. (R. 191-92). Two months later, on June 27, 2001, plaintiff returned to the clinic for a blood sugar check. She reported that she had been off of her blood pressure medication for two weeks and was out of all of her medications, that she had a few headaches and had not been adhering to her diet. Mason diagnosed HTN, NIDDM, arthritis and obesity. The following day, she added a prescription for Lipitor after receiving the results of plaintiff's lipid profile. (R. 190). On July 11, 2001, Mason treated plaintiff for complaints of headache, fever and cold symptoms. She diagnosed acute sinusitis,

pharyngitis, and HTN. Mason's note for an office visit in September 2001 indicates that plaintiff had failed to pick up her medications as ordered and had been out of her blood pressure medication for two weeks. She complained of stomach cramps. Mason diagnosed HTN, abdominal pain and high cholesterol. Mason ordered labs and prescribed medication. (R. 188).

There are no office notes for treatment between September 2001 and February 2002. On February 13, 2002, plaintiff complained of headache. Mason's note reflects that plaintiff had not had medications for at least two months. Mason diagnosed HTN, sinusitis and headache, and prescribed medications. (R. 186). On February 25, 2002, Mason treated plaintiff for an abrasion to her right hand and right shoulder pain. (R. 187). On March 4, 2002, plaintiff reported pain on the left side of her neck, starting that morning, and that she had possibly "slept wrong." Mason noted a muscle spasm in plaintiff's neck. (R. 185). On April 1, 2002, Mason directed plaintiff to restart her medications and not to run out of her medications, after plaintiff's blood pressure was measured at 182/110. (R. 184).

On May 15, 2002, plaintiff reported for a consultative examination by Dr. Anthony Soler, a family practice physician. Dr. Soler had no medical records to review. Plaintiff complained of chronic neck pain, at times radiating into her right hand. She further complained of diffuse muscle and joint pain in her shoulders, elbows, hands, upper and lower back, hips, knees and feet. Plaintiff reported constant chest pain. Dr. Soler observed that plaintiff had "a depressed mood" and was "mildly anxious." He examined plaintiff and ordered an x-ray of her right shoulder and arm. The x-ray of plaintiff's humerus resulted in

3

a "normal study" with "no evidence of fracture, dislocation or arthritis," and the x-ray of her shoulder revealed a "strain pattern at rotator cuff insertion to the humerus," but no suggestion of impingement, a normal glenohumeral joint with no evidence of subluxation, and no soft tissue calcifications.  Dr. Soler diagnosed chronic pain syndrome secondary to diffuse osteoarthritis, chronic depression with depressive personality disorder suggestion, high blood pressure and obesity.  He concluded that she is able to stand or walk for two hours in an eight-hour work day with regular breaks every thirty minutes, that she can sit for six hours with regular breaks every one to two hours, can lift and carry ten to twenty pounds occasionally and ten pounds frequently, has moderate postural limitations to pulling, mild to moderate limitations to frequent bending, stooping, crouching, climbing and crawling, and no limitations to kneeling or balancing.  He indicated that she has mild manipulative limitations with reaching, no limitation to feeling, fingering or handling, no visual or significant communicative impairment, and that she should avoid cold temperature extremes and heights and is probably unable to drive.  (Exhibit B1F, R. 150-55).

Eight and a half months later, on January 31, 2003, plaintiff was treated and released from the emergency room for amputation of the tip of her left ring finger.  (R. 171-78).

On July 11, 2003, fifteen months after her previous visit to Mason, plaintiff reported to the clinic for a blood sugar check and refill of her blood pressure medication. Plaintiff's pain level was recorded as "0." She was restarted on her medications and was prescribed Zyrtec for allergy symptoms (nasal drainage and watery eyes).  (R. 183).  Mason added a prescription for Glucophage after receiving lab results indicating an increase in plaintiff's

4

Hemoglobin A1c from 6.6 to 7.6. (R. 182, 199). Plaintiff had follow-up appointments in October and December 2003. Mason noted edema in plaintiff's feet. (R. 180-81).

On February 18, 2004, Dr. James Colley performed a consultative physical examination. He reviewed the previous report from Dr. Soler. Plaintiff's chief complaints were arthritis and hypertension with hypertensive headaches, which she rated at a pain level of 4 on a scale of 10. She had multiple complaints of arthritic pain, including chronic neck pain radiating into her right hand with right hand weakness, paraesthesias of the right hand, occasional pain and stiffness in her left hand, low back pain radiating down both legs, weak knees that keep her up at night due to pain, and right foot swelling "from time to time." She reported that she was currently receiving no medication for her blood pressure and did not know that it was as high as 210/140, as recorded in the examination. She reported that she did very little, other than watch television. She indicated that she does not have a car and does not drive, but does some yard work, all of the housework, and occasionally takes care of one of her grandchildren. On physical examination, Dr. Colley observed that plaintiff was pleasant as compared to the May 2002 examination, that she had a good gait, sat comfortably in the examination room, and was able to get on and off the examination table without difficulty, and to remove her shoes and socks without difficulty. He noted that she "had a negative straight leg raise bilaterally," had a "normal range of motion study," a "normal gait," "no peripheral edema, no cyanosis," "no paravertebral muscle spasm, tenderness, crepitus, effusions, deformities or triggerpoints," and "good dexterity bilaterally" in her fingers and thumbs. He reported that her motor strength was 5+/5 in the upper and lower

5

extremities bilaterally, her bilateral grip strength was 5+/5, and that she had good muscle bulk and tone. He diagnosed: (1) poorly controlled hypertension, with hypertensive headaches; (2) arthralgias of the neck, lumbosacral spine, anterior chest wall, and knees; and (3) obesity. He noted that she was not taking antidepressants and did not appear depressed. As to plaintiff's functional limitations, Dr. Colley concluded:

> On examination today, she had normal range of motion of all her joints and extremities and reproduced no chest wall tenderness. She had no paravertebral muscle spasm and had a normal straight leg raise. Strength was normal, as was her reflexes.
>
> The number of hours that the claimant could be expected to stand and walk in an eight-hour workday is at least six hours.
>
> The number of hours the claimant could sit in an eight-hour workday is unrestricted.
>
> The claimant needs no assistive device and none are medically necessary.
>
> The amount of weight the claimant could lift or carry would be 50 pounds occasionally and 25 pounds frequently.
>
> There are no postural limitations. There are no manipulative limitations. There are no visual limitations. She also communicates effectively. There are no other limitations.

(Exhibit B6F, R. 205-210).

On March 18, 2004, plaintiff reported to Glen D. King, Ph.D., for a consultative psychological examination. Dr. King reported that plaintiff "knew her social security number as well as her birth date without referral to written information." Plaintiff told Dr. King that she had never seen a mental health professional for treatment, had finished the 12th grade in special classes and has never had a driver's license. On mental status examination,

Dr. King noted:

> Bernice Myles is a 45 year old single black female who presents for the examination with thought retarded in progress and form and affect haughty, uncooperative, sarcastic, and difficult. She was oriented as to person, place, and time. She claims that she does not sleep very much, but when questioned carefully she indicated to the examiner that she averages eight hours per 24 hour period of time which is adequate. She does not appear at all tired. She claims not to know whether she is losing or gaining weight or about her appetite. She attempts to claim auditory and visual hallucinations which are simply not credible. There was no evidence for hallucinations, delusions, depersonalization, or derealization. Her general fund of information was poor and her memory was clouded on a purposeful basis. She reports no suicidal ideation or intent but claims that she made a suicide attempt in her 30's when she took an overdose of pills, but she required no medical attention. She appeared to be malingering throughout the evaluation.

(Exhibit B7F, R. 211-213). On the WAIS-III, she generated a verbal IQ score of 58, performance IQ of 60, and a Full Scale IQ of 55. Dr. King noted that these scores "technically" placed her in the moderate range of mental retardation. He further stated, "However, Ms. Myles was very uncooperative and lacked motivation throughout the assessment of her intellectual ability. While it is likely that she functions in the mild range of mental retardation, it is the examiner's opinion that she does not function at the low level represented by these test results. Thus, she appeared to be uncooperative and somewhat malingering throughout the evaluation." He gave her an Axis I diagnosis of "Malingering," and an Axis II diagnosis of "Mild Mental Retardation." (R. 213).

On April 8, 2004, non-examining psychologist Kenneth Warren, Ph.D., reviewed plaintiff's records and found insufficient evidence to substantiate a mental disorder. He noted:

> This is a 45 year old female allegations of special education[,] depression & can't get along with others. School records indicate that the clmt was not in

>special education classes but did make D's in the majority of her classes. She was sent to a C.E. and did not cooperate with testing and was "haughty, uncooperative, sarcastic, and difficult" with the examiner. She attempted to claim auditory and visual hallucinations that were "simply not credible" and she "appeared to be malingering through[]out the evaluation". WAIS scores were 58, 60, 55 and were not valid. The C.E. provider opines that the clmt was more than likely functioning somewhere in the mildly mentally retarded range. This is not supported by ADL's or past work and we are unable to establish a life long history of MR. Case rated as insufficient evidence due to malingering. No evidence of depression.

(Exhibit B9F, R. 222, 234).

Plaintiff again sought treatment from Mason on May 25, 2004, five months after her previous visit. She complained of neck and right arm pain, and told Mason that the pain lasted about twenty minutes and then went away, and that this had happened the previous week. Mason noted full range of motion in plaintiff's arms and that plaintiff's grip strength was equal bilaterally. Plaintiff's diagnoses were HTN, NIDDM, hyperlipidemia, and neck pain. Mason adjusted plaintiff's diabetes medication after receiving lab results. (R. 245, 243). On July 12 2004, plaintiff visited the clinic with complaints of cold symptoms. She was diagnosed with HTN, NIDDM, and an upper respiratory infection. (R. 242). On September 28, 2004, plaintiff complained of right arm pain radiating down from her neck and with raising her arm above her shoulder. She reported that Motrin "eases it some." (R. 241).

Plaintiff's next office visit was more than six months later, on March 15, 2005, when she complained of right great toe pain on a level of ten out of ten. (R. 239). Plaintiff next visited the clinic on April 29, 2005 for follow-up. Mason noted that plaintiff was noncompliant with medications and with her diet. (R. 238).

Plaintiff returned to the clinic for follow-up three months later. She complained of

8

"constant" right arm pain at a level 10 of 10. (R. 235, 237). Mason listed plaintiff's diagnoses as NIDDM, HTN, hyperlipidemia and tendonitis of her right arm. She taught plaintiff tendon stretching exercises and told her to ice her right hand and wrist twice a day for twenty minutes. Mason advised plaintiff to follow up in three months or as needed. (R. 235). The administrative record contains no further treatment notes from Mason.[1]

On June 16, 2005, after plaintiff's claim was denied at the initial administrative level, an ALJ conducted an administrative hearing. Plaintiff appeared at the hearing without representation. The ALJ advised plaintiff:

> Because you are not represented by an attorney or other representative, I have to tell you that you have the right to be represented by an attorney or other representative if you can get one. A representative can assist you in terms of obtaining evidence, presenting evidence, examining witnesses, cross-examining witnesses and making arguments on your behalf. Whether or not you obtain a representative, you can submit additional evidence. If you cannot afford a representative, I should tell you that some representatives charge what's called a contingent fee, that's a percentage of what they get if they win, nothing if they lose, so there's no up front cost to you. The Legal Services Corporation, to my knowledge, charges nothing at all, win or lose, if they'll take your case, that's always a big if. If you wish to obtain a representative, you may do so by using the sheet that we sent you. We sent you some information, along with the list of representatives on 3B.

(R. 253-54; see also Exhibit B4B, R. 44-48 (June 10, 2004 correspondence from ALJ to plaintiff regarding representation)). After plaintiff denied having received the ALJ's previous correspondence regarding her right to representation, the ALJ directed an assistant to give it to the plaintiff at that time. He explained:

---

[1] The ALJ obtained the records in Exhibit B10F (Mason's treatment of plaintiff from May 2004 until July 2005) after the hearing. (See R. 149)(ALJ's October 27, 2005 letter to plaintiff regarding inclusion of Exhibit B10F in record).

> Okay, for the record, 3B contains a list of the Alabama Lawyers Referral Services, Legal Services of Montgomery, and the National Association of Social Security Reps, [NOSSCR], with a phone number. The same was also sent to you, but we're giving it to you again, right now, so that if you would like to obtain a representative, we can grant you one adjournment to do so, and you may do so by calling the numbers on that list or by using the yellow pages under attorneys. or by getting a referral from friends or relatives, or really, any method that will get you a representative if you want one, will probably be alright, keeping in mind that we cannot force or compel anybody to represent you, it has to be voluntary on your part and on their part. Knowing all this, do you want to get a representative or do you want to proceed yourself?

(R. 254). Plaintiff responded, "Proceed myself." (R. 255). On questioning from the ALJ, the plaintiff indicated that she had no objection to the exhibits or to the vocational expert. (Id.). The ALJ questioned plaintiff briefly. Plaintiff testified as to her name, address, and age. She testified that she had received a high school diploma and lived with her son and daughter, who take care of the cooking, cleaning, laundry, dishes and household needs. The ALJ asked plaintiff to tell him the problem or problems that kept her from being able to work. Plaintiff responded, "My arm." The ALJ noted that plaintiff had a splint on her right arm and asked plaintiff, "What is the problem with the arm?" Plaintiff responded, "Arthritis and something they call that name." The ALJ asked the plaintiff about a doctor whose reports were not in the record, and plaintiff advised that she was seeing Tammy Mason. The ALJ asked if plaintiff had seen any other doctor whose reports were not in the record, and plaintiff responded, "Not as I know." The ALJ advised plaintiff that he would get reports from Tammy Mason, and asked, "All right, anything else?" Plaintiff responded, "No." He asked her if she were right-handed, and she stated that she is. (R. 255-57). The ALJ questioned the vocational expert. He advised plaintiff that she had the right to ask questions,

and she responded that she had no questions.  The ALJ asked, "You have anything else you wanna tell us today?"   Plaintiff responded, "No, sir."  The ALJ again told plaintiff that he would get records from Tammy Mason, and concluded the hearing.  (R. 262-63).

The ALJ rendered a decision on January 24, 2006.  The ALJ concluded that plaintiff suffered from the severe impairments of "non-insulin dependent diabetes mellitus; Hypertension, poorly controlled with headaches; tendonitis right arm; generalized arthralgias; probable sub-average or borderline intellectual functioning; and obesity." (R. 21).  He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform her past relevant work as a school cleaner, hand packer, hotel/motel housekeeper and fast food worker.[2]  Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act.  On  November 30, 2006, the Appeals Council denied plaintiff's request for review.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.  Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

---

[2] The ALJ also noted the vocational expert's testimony regarding jobs existing in significant numbers in the regional economy which plaintiff can perform, including small parts assembler, simple machine tender, and product assembler.  (R. 23).

11

(11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff contends that the Commissioner applied improper legal standards and that the decision is not supported by substantial evidence. Specifically, plaintiff argues that the ALJ failed to develop her claim properly because he did not fully question her about her functional limitations despite the report of mild mental retardation from the consultative examiner and the medical records documenting her impairments. Plaintiff further argues that the ALJ erred by failing to consider a finding of disability under the 12.05 mental retardation listings. She also notes the ALJ's errors in stating (in the first sentence of his decision) that: (1) the claim was for disability benefits and supplemental security income, when no Title II application was taken on plaintiff's behalf; and (2) that the applications were filed on December 10, 2003, rather than indicating plaintiff's protective filing date of November 18, 2003.[3] Plaintiff further complains of the ALJ's statement that her high school records

---

[3] December 10, 2003 was the actual, as opposed to protective, filing date of the application. (R. 58, 63). There is no indication that this difference in the filing dates affected the ALJ's decision in this case.

indicate that plaintiff obtained grades "ranging from A's to F's." She argues, "Presumably the ALJ indicates this to somehow negate the mental functioning findings of the consultative examination," when "a review of Plaintiff's high school grades show one A- in physical education, with the majority of her grades being D's, C's, and F's." (Plaintiff's brief, Doc. # 12).

> "A hearing before an ALJ is not an adversarial proceeding" and, whether or not the applicant is represented, "the ALJ has a basic obligation to develop a full and fair record." Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997)(per curiam). The ALJ has a special duty to ensure the record demonstrates that an *unrepresented* claimant who did not waive counsel was not prejudiced by the lack of counsel. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995)(per curiam). By implication, where counsel has been waived, the special duty to develop the record does not take effect. See id.
>
> The ALJ is required to develop the claimant's complete medical history for at least the 12 months preceding the month in which the application was filed, and to make every reasonable effort to help a claimant get medical reports from the claimant's own medical sources when permission is given. See 20 C.F.R. § 416.912(d). Medical sources should be recontacted when the evidence received from that source is inadequate to determine whether the claimant is disabled. 20 C.F.R. §§ 414.1512(e), 416.912(e). "Nevertheless, the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003)(per curiam).

Robinson v. Astrue, 235 Fed. Appx. 725 (11th Cir. Apr. 11, 2007).

The court concludes that plaintiff was advised properly of her right to representation,[4] that she waived that right (R. 253-55), and that her mental limitations did not preclude a valid waiver. The only evidence in the record of mental retardation is in the report of the consultative psychological examiner, Dr. King, who made a diagnosis of mild mental

---

[4] Plaintiff does not argue otherwise.

13

retardation.  Dr. King indicated that it was "likely that she functions in the mild range of mental retardation," but also determined that plaintiff was uncooperative and malingering throughout the examination.  Plaintiff had reported to Dr. King that she had finished the 12th grade in "special classes."  Dr. King concluded that plaintiff was capable of managing any benefits granted to her.  (R. 211-13).  However, plaintiff's statement to Dr. King was untrue.  Plaintiff was not, in fact, in special education.  On a disability report form, plaintiff indicated that she completed 12th grade and one year of college, and that she did not attend special education classes.  (R. 114).  The special education coordinator for the Lowndes County Schools, where plaintiff attended high school, reported that the school system has no record indicating that plaintiff received special education services.  (R. 141).  Plaintiff's school records show that she graduated from high school on June 1, 1979, and that she did not fail any classes in high school (9th through 12th grades), but received 1 "A", 7 "B"s, 13 "C"s and 18 "D"s.  The non-examining psychologist, Dr. Warren, who was aware that plaintiff was not in special education classes but made "D"s in most of her classes, determined that plaintiff's records did not support a finding of mild mental retardation.[5]

The ALJ concluded that plaintiff had "probable sub-average or borderline intellectual functioning."  He noted her erroneous report of special education classes to Dr. King, and also Dr. King's suggestion that plaintiff was malingering during the consultative

---

[5] "Findings of fact made by State agency medical and psychological consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review."  SSR 96-6p.   Such consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  Id.

examination. He also considered Dr. Warren's determination that there was insufficient evidence of a mental impairment and plaintiff's high school record, indicating that she graduated from high school and did not repeat any grades. The ALJ's conclusion that plaintiff did not suffer from mild mental retardation is supported by substantial evidence. The court concludes that plaintiff's waiver of representation was not precluded by her mental limitations and that it was valid.

Plaintiff argues that, "[d]espite the consultative evaluation indicating Plaintiff's lowered intelligence, the ALJ failed to even consider a finding of disability under the 12.05 mental retardation listings." (Doc. # 12, p. 7). As the Commissioner argues, the only IQ scores in the record were determined by the examiner to be the result of malingering and plaintiff's failure to cooperate in the evaluation. Thus, there were no valid IQ scores upon which to base a finding under Listings 12.05 B, C, or D, nor is there evidence to suggest plaintiff was unable to follow directions "such that the use of standardized measures of intellectual functioning is precluded" so as to support a finding of disability under Listing 12.05A. The ALJ considered Dr. King's report, including the IQ scores, and determined that plaintiff's impairments did not meet or equal any of the listings. (R. 20-21). As noted above, the ALJ's finding that plaintiff suffers from "probable sub-average or borderline intellectual functioning" is supported by substantial evidence.

The ALJ's questioning of the plaintiff was very brief. However, he asked her about additional records from Mason – and subsequently obtained those records – and asked whether she had seen any other doctors whose reports were not in the record. He also

15

inquired as to whether she had anything else that she wanted to tell him during the hearing. As the Commissioner argues, the record contained other evidence of plaintiff's accounts of her functional limitations, in her reports to the consultative examiners and in forms she completed. (See R. 83-88, 117-21, 135-39, 150, 205-06). Plaintiff has not demonstrated any prejudice by reason of the ALJ's failure to ask more questions of the plaintiff during the hearing, even assuming that it constitutes error.

Finally, plaintiff suggests that the ALJ erred by failing to determine whether a concurrent Title II application should have been taken from the plaintiff. While processing plaintiff's 2002 application for benefits, disability specialist Dianne Naftel questioned plaintiff about the discrepancies between the work history plaintiff had listed and the jobs shown on the DEQY (Detailed Earnings Query).[6] Naftel noted that the plaintiff "seems a little slow in understanding," and stated that she "tried to get as much information as possible from her" regarding her work history. (R. 124). On the form transmitting the disability determination on the previous application, Naftel indicated that plaintiff had worked for three years. (R. 26, Block 20, Vocational Background). The form containing Naftel's conclusion regarding the amount of time plaintiff had worked was in the record before the ALJ. Three years is an insufficient amount of time to give rise to fully insured status, which requires forty quarters of coverage. (20 C.F.R. §§ 404.115, 404.130). Thus, the ALJ did not err in failing to investigate why concurrent DIB and SSI applications were not taken on plaintiff's

---

[6] As plaintiff argues, the current adminstrative transcript does not include the earnings record.

16

behalf.[7]

## CONCLUSION

Upon review of the record as a whole, the court concludes that legal standards were applied properly in the decision of the Commissioner and that it is supported by substantial evidence.[8]  Accordingly, the decision is due to be AFFIRMED.  A separate judgment will be entered.

---

[7] In her statement of facts, but not in her argument, plaintiff states, "Due to lack of insurance and funds for medical care, the progress notes do indicate occasions upon which Plaintiff has been without medication to address these problems." (Doc. # 12, p. 4).  Plaintiff does not cite to the record.  The court found no indication in the record that plaintiff's noncompliance was due to a lack of insurance or money for medical care.

[8] The ALJ's determination regarding plaintiff's residual functional capacity is supported by substantial evidence.  (See particularly Dr. Colley's opinion, R. 210 and also Mason's records, indicating no opinion regarding plaintiff's functional limitations).  However, the court notes that the VE testified that even if plaintiff had IQ scores in the mentally retarded range, the only past work of plaintiff's that would be precluded by such a limitation would be the fast food worker job.  (R. 259).  Additionally, even if plaintiff were limited to sedentary work, the VE testified as to a significant number of jobs that plaintiff would be able to perform with her limitations. (R. 261-62).

Done, this 31st day of January, 2008.

                                                  /s/ Susan Russ Walker  
                                                  SUSAN RUSS WALKER  
                                                  UNITED STATES MAGISTRATE JUDGE